ORIGINAL

LAW OFFICES

# BARRY LEVIN

SUITE 406
666 OLD COUNTRY ROAD
GARDEN CITY, NEW YORK 11530

(516) 222-4500
FACSIMILE (516) 228-8120

WRITER'S DIRECT LINE

(516) 222-4502

BARRY LEVIN

KELLY GUTHY

September 26, 2002

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ OCT 2 2008 ★

BROOKLYN OFFICE

Honorable Frederic Block
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    United States v. Peter Gotti et al.
(Vincent Nasso), 02 Cr. 606 (FB)

Dear Judge Block:

This letter is submitted in support of defendant Vincent Nasso's application for a severance from the remaining RICO defendants. This letter is written pursuant to the Court's directive and we respectfully reserve the right to make a more formal motion at a later date if necessary.

For the reasons set forth herein, we respectfully request this Court grant Vincent Nasso's application for a severance, pursuant to FRCP Rule 14, from the remaining RICO defendants and that Mr. Nasso be tried with his brother, Mr. Julius Nasso.

## Background

Mr. Vincent Nasso holds a medical doctorate degree having graduated Ross University School of Medicine in 1986. For the past 16 years he has owned and operated pharmacies in the New York area. Mr. Nasso has no prior criminal record and has lived a law abiding life, contributing to his community through the medical field for the past 16 years.

1

The indictment, which is the subject of this application, does not allege that Mr. Nasso is a member of the Gambino crime family. The Indictment before this Court contains 90 pages and 68 counts of alleged wrongdoing. Most of the indictment concerns itself with allegations of Gambino crime family activity relating to RICO, extortion, gambling and money laundering which, with the following exception, does not pertain to defendant Vincent Nasso.

Although Vincent Nasso is charged with Racketeering in Count One and Racketeering Conspiracy in Count Two, the only predicate acts which he is charged with, as they relate to racketeering, is his alleged involvement in a conspiracy to defraud MILA and an alleged conspiracy to extort and attempt to extort the movie actor, Steven Seagal (John Doe 5).

Simply stated, the government's theory is that Mr. Nasso paid Anthony Ciccone $400,00.00 to obtain organized crime influence to assist him in obtaining and thereafter maintaining a pharmaceutical contract with MILA, which is a consortium of shipping companies and ILA labor trustees. [1]

Secondly, Mr. Nasso, according to the government's theory, is alleged to have participated in an attempted extortion of the movie actor Steven Seagal (John Doe 5). It should be noted that both Vincent Nasso and his brother, Julius Nasso have a 13-year relationship with Mr. Seagal, both on a business and social level.

In the remaining counts of the indictment, the government charges 64 counts, all related to a series of alleged Gambino crime family activity. The government estimates the trial in this matter to last approximately 3 months and they intend to introduce evidence going back to the 1991 trial of John Gotti and the Ravenite Social Club, all of which is entirely unrelated to any alleged activity of Vincent Nasso.

Additionally, the government has produced in excess of 25,000 pages of Rule 16 discovery material. Included within these discovery materials are three years' worth of intercepted oral communication which I presently have contained in ten 5-inch loose leaf binders in my office. Notwithstanding the voluminous amount of discovery produced by the government to date, Vincent and Julius Nasso comprise less than ten percent (10%) of the evidence produced by the government thus far.

Moreover, although Vincent Nasso is intercepted on 81 taped conversations, I submit to this Court that all of them, with the possible exception of portions of six individual tapes, have nothing to do with the charges set forth in the indictment. Therefore out of the 2,200 hours of

---

[1] The government, through AUSA Andy Genser, has admitted in a prior conversation with your affirmant that the government does not have direct evidence of Mr. Nasso making such a payment. Secondly, Mr. Nasso vehemently denies paying Anthony Ciccone or any other member of organized crime money to obtain the MILA contract

intercepted conversations provided by the Government in discovery  thus far, less than three hours are relevant to the charges in the indictment against Mr. Nasso.

Furthermore, a careful review of the tapes and government's draft transcripts reveal a substantial antagonistic defense between the Nasso's and codefendants, Anthony Ciccone and Primo Cassarino. During numerous intercepted conversations Mr. Ciccone is overheard belittling and threatening both Vincent Nasso and Julius Nasso for not complying with his demands.

In a most telling conversation dated December 8, 2000, government tape number S-7216 Anthony Ciccone tells Vincent Nasso "You just keep taking bullets. You and your brother. All the bullets you take you gotta be dead by now." [2]

Most relevant is further on in that same conversation Anthony Ciccone and Vincent Nasso are discussing the fact that Mr. Nasso had received a subpoena concerning MILA and that Mr. Nasso appeared to be nervous. Ciccone, in a response to Mr. Nasso's reluctance to discuss these issues with Ciccone, states, "You didn't do anything wrong." [3]

Further on during this same conversation, after Vincent Nasso has left Anthony Ciccone's presence, Anthony Ciccone is heard bragging to Mr. Cassarino about how he intimidated the Nasso's:

PRIMO:     Was uh, what's his name there, What the fuck'd you call him?

SONNY:     Yeah, the midget

PRIMO:     The midget, hee hee . . .

SONNY:     He asked me 10 times, who, the midget. I told him, he says if you can forgive the midget. Fucking guy. And that other guy, the whole, ya know, the guy in uh, up in Toronto?

PRIMO:     Yeah

SONNY:     He just made a whole fucking turnaround for this. I'll tell you when I see you.

---

[2] The government's draft transcript states that the conversation was between Jules Nasso and Anthony Ciccone, but it is, in fact, between Vincent Nasso and Anthony Ciccone.
[3] This statement by Mr. Ciccone is conveniently missing from the government's transcript but can be clearly heard when one listens to the actual tape recording.

PRIMO:    Good?

SONNY:    Yeah

PRIMO:    As long as it's good, right

SONNY:    Yeah, yeah, yeah, no

PRIMO:    Good, good, good, good

SONNY:    When I see ya!

PRIMO:    All right. Good

SONNY:    All right. I guess sometimes you got to get your fucking banana twisted, otherwise these fucking guys, they don't understand nothing else, ya know.

PRIMO:    I hear you

SONNY:    But, you seen what I would've done, what I just did to these fucking guys, wow, you can't believe it. I'll tell you tomorrow night. All right buddy.

In another telling conversation, dated February 2, 2001, government tape number S-7791, Mr. Ciccone states, "Maybe you even lucky that wasn't me. It might have been a little while, I might have hit you with a fucking bat. It is my money. You, you understand what I am saying to you."

In another telling conversation, dated February 14, 2001, government tape number S-1036, defendant Ciccone is speaking with Primo Cassarino, who were discussing Vincent Nasso. In the course of the conversation, defendant Cassarino states to Ciccone, "In all them years he never gave anything and we take bullshit for him." It is apparent from a review of the tape that the co-defendants are discussing the fact that Vincent Nasso never paid them any money which is a material inconsistency with the government's theory of prosecution.

In a conversation dated September 24, 2001, when Anthony Ciccone realizes that the reason Julius Nasso did not respond to his phone calls was because Julius Nasso was hospitalized, Anthony Ciccone told Mr. Cassarino, "Tell him Sunday he shouldn't have went to the hospital. We'll take him to the fish market to put him on ice."

4

In <u>Zafiro v. U.S.</u>, 113 S.Ct. 933, the Supreme Court held that although an antagonistic defense does not mandate an severance under Rule 14, antagonistic defenses that substantially inhibit a defendant's ability to put forth his defense at a joint trial with his co-defendants is a material factor a court must consider in determining whether to grant a severance. See, also<u>, U.S. v. Gatien</u>, 1997 U.S. Dist. LEXIS 16366

The balance of the intercepted conversations concern Mr. Nasso socializing with Anthony Ciccone and helping Primo Cassarino and Mr. Ciccone with their own individual medical needs by providing advice and discussing prescription drugs that would be beneficial to their own needs and the needs of their families with regard to their respective medical conditions.

Although Mr. Nasso will not deny his relationship with Mr. Ciccone, he vehemently denies involvement in any criminal activity with Mr. Ciccone. However, due to the overwhelming nature of the charges and intercepted communications of Mr. Ciccone and Mr. Cassarino involving extortion, gambling and other criminal activities, all of which are unrelated to Mr. Nasso, it is the defense's position that the spillover prejudice from such conversations and the government's attempt to put in insurmountable enterprise evidence against the remaining racketeering defendants, will  create extreme prejudice against Vincent Nasso.  A jury in this case would be incapable of separating the individualized evidence as it pertained to Mr. Nasso from the large amount of organized crime evidence the government will introduce against the remaining racketeering defendants.

**<u>Spillover Prejudice</u>**

In <u>Zafiro v. United States</u>, <u>supra</u>, the Supreme Court recognized the potential dangers of spillover prejudice, <u>i.e.</u>, the prejudice to a defendant at a joint trial when evidence that is not admissible against him is admitted against his co-defendants

> "We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.  Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.  **For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant is guilty.  When many defendants are tried together in a complex case and they have markedly different degrees of culpability,**

5

>**this risk of prejudice is heightened."** See, <u>Kotteakos v. United
>States</u> 328 U.S. 750, 774-75 (1946), [emphasis added] 506 U.S. at
>539.

While we recognize that the Second Circuit has generally failed to find reversible error where district courts have rejected severance claims based on spillover prejudice, we submit that in numerous situations similar to those at bar, severance has been granted due to spillover prejudice. See, <u>United States v. Dinome</u>, 954 F.2d 839, 844-45 (2d Cir. 1992) (holding that defendants were entitled to severance based on spillover prejudice in large organized crime case after dismissal of RICO charges against them); <u>United States v. Williams</u>, 181 F.Supp.2d 267, 302 (S.D.N.Y. 2001) (granting severance to non-RICO defendant due in part to spillover prejudice from evidence of alleged murders and attempted murders by RICO defendants); <u>United States v. Bellomo</u>, 954 F.Supp. 630, 650-51 (S.D.N.Y. 1997) (granting severance to non-RICO gambling defendants from RICO defendants in large organized crime case); <u>United States v. Gatien</u>, 1997 U.S. Dist. LEXIS 16366 (Block, J.) (granting severance to non-RICO defendants based on spillover prejudice).

In an analogous circumstance to that presented here, the Second Circuit found that a defendant suffered spillover prejudice, requiring reversal of his conviction on a substantive Hobbs Act charge, when his conviction on the RICO and RICO conspiracy counts were reversed for insufficient evidence. In <u>United States v. Tellier</u>, 83 F.3d 578, 579-80 (2d Cir. 1996). A defendant was charged with RICO, RICO conspiracy, and violating the Hobbs Act, 18 U.S.C. §1951, in connection with his role in the so-called "Tellier Organization." A number of his codefendants were tried for various crimes including racketeering, firearms, transportation of stolen property and other violations. <u>Tellier</u>, 83 F.3d at 579. The trial itself involved evidence of criminal activity such as robberies, murders and drug distribution. The Second Circuit reversed defendant's RICO and RICO conspiracy convictions because of insufficient evidence on one of the two predicate acts charged against him (a marijuana conspiracy). The court then concluded that spillover prejudice required reversal of the defendant's substantive Hobbs Act conviction, as well.

In language that, we respectfully submit, is instructive here, the Second Circuit held as follows:

>"We believe that Roy Tellier's RICO conviction also dictates
>reversal of his Hobbs Act conviction given the enormous
>amount of prejudicial spill-over evidence admitted to prove
>the RICO "enterprise" and its extensive criminal activities.
>Roy Tellier's Hobbs Act conviction involved a single robbery,
>to which all but a tiny sliver of the evidence admitted on

the RICO charges is irrelevant. The RICO charge allows
the government to introduce evidence of criminal activities
in which a defendant did not participate to prove the
enterprise element. See, United States v. DiNome, 954
F.2d 839, 843 (2d Cir.), cert denied, 506 U.S. 830,
113 S.Ct 94,95(1992). If the RICO counts fail, prejudice
on the other counts is highly likely. In such circumstances,
defendants who no longer face RICO charges should be
severed so that the jury is not exposed to evidence
that is irrelevant to the remaining charges. Id. at 845.
No extended discussion of the evidence is needed to
determine that the prejudice here was indisputable. It
suffices to note that the government's brief contains
a description of the defendants' crimes that is 43
pages long and recites fifteen major robberies,
four murders, one attempted murder, two sales
of stolen drugs, and one bribery of a witness.
Roy Tellier's RICO and Hobbs Act convictions
must therefore be reversed. He may of course be
retried on the Hobbs Act count. Teltier, 83 F.3d at 581-82.

In United States v. Gatien, 1997 U.S. Dist. LEXIS 16366, this Court, in determining whether substantial prejudice exists, considered the following factors:

"(1) the number of defendants; (2) the number of counts;
(3) the complexity of the indictment; (4) the estimated length
of trial; (5) disparities in the amount of involvement by each
defendant in the overall scheme; (7) possible conflict between
various defense theories or trial strategies; and (8) prejudice from
evidence admitted against co-defendants which is inadmissible or
excluded as to a particular defendant." Id. citing U.S. v. Upton,
856 F.Supp 727, 736 (E.D.N.Y. 1994); Gallo, 668 F. Supp. at
749.

For all the reasons set forth herein and in the accompanying briefs of co-defendants Julius Nasso and Peter Gotti, it is respectfully submitted that the factors set forth herein above overwhelmingly lead to the conclusion that Vincent Nasso should be severed from the remaining RICO defendants.

**Stipulating to an Enterprise**

In consideration of a severance, the defendant Vincent Nasso would stipulate to a reasonable amount of enterprise proof that the government wishes to introduce. In this regard the amount of evidence of other crimes by other defendants could be excluded and the defendant Nasso's case would stand on the proof of alleged predicate acts for which he is charged. This certainly could be presented in a matter of days as opposed to the matter of months estimated by the government for overall trial in this matter.

Moreover, the Second Circuit has recognized and stated that a defendant can stipulate that the charged RICO enterprise existed and that the predicate acts, if proven, constituted the requisite pattern of racketeering activity. U.S. v. Dinome, 954 F.2d 839, 843 (2d Cir. 1992).

**Conclusion**

In conclusion, for the reasons set forth herein, we join the applications of our co-counsel Mr. Russell M. Gioiella on behalf of defendant Juluis Nasso and Mr. Gerald Shargel, on behalf of defendant Peter Gotti and respectfully request that this Court sever defendant Vincent Nasso from the remaining racketeering defendants, that this Court order Vincent Nasso be tried with his brother and codefendant, Julius Nasso and set this matter down for trial for a date on or after April 1, 2003.

Most Respectfully submitted,

BARRY LEVIN (2079)

cc:    AUSA Andrew Genser
       All Defense Counsel